IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

IN RE GRAND JURY SUBPOENA TO                             SEALED ORDER
AMAZON.COM DATED AUGUST 7, 2006
                                                                             Case No. 07-GJ-04

_____

      Before the court is Amazon.com's motion to quash that part of a grand jury subpoena requesting the identities of a representative sample of a specified group of used book buyers. *See* dkt. 1. Amazon also has moved to unseal redacted versions of its motion and supporting documents. *See* dkt. 4. The grand jury, appearing by the United States Attorney, opposes both motions. At a June 25, 2007 hearing, I granted in part and denied in part the motion to quash and denied without prejudice the motion to unseal. This order serves as an overview of those decisions.

      On August 7, 2006, a federal grand jury sitting in this district issued a subpoena duces tecum to Amazon.com ("Amazon") seeking information about a prolific seller of used books on Amazon, grand jury target Robert B. D'Angelo. The grand jury is investigating whether D'Angelo evaded taxes or engaged in a mail fraud/wire fraud scheme involving D'Angelo's sale of about 24,000 used books over four years through Amazon's website to third-party book buyers. The grand jury subpoena directed Amazon to provide virtually all of its records regarding D'Angelo, including the identities of the thousands of customers who had bought used books from D'Angelo. The government subsequently chose to reduce this scope of this request to the identification of 120 book buyers, 30 per year for the four years under investigation. The government's plan was for special agents of the FBI and IRS to contact these 120 used book

buyers in an attempt to develop concrete evidence necessary to lay a transactional foundation for criminal charges of fraud and tax evasion against D'Angelo. The government does not suspect Amazon or D'Angelo's customers of any wrongdoing, nor does it consider them victims of D'Angelo; they simply are bricks in the evidentiary wall being erected by the grand jury.

Amazon willingly provided most of the requested information but it has refused to identify any book buyers to the government, citing the buyers' First Amendment right to maintain the privacy of their reading choices. The government disagrees, responding that the Supreme Court never has recognized such a First Amendment privilege against disclosure to a grand jury, and further that the grand jury has a genuine investigative need for the identities of at least some of D'Angelo's customers. As discussed in more detail at the June 25, 2007 hearing, I have concluded that: (1) customers who bought used books from D'Angelo through Amazon do have a cognizable First Amendment right; (2) this court must consider this right when determining whether to require Amazon to comply with the grand jury subpoena; (3) the grand jury has a genuine investigative need to contact some of D'Angelo's used book customers directly; and (4) a single-blind process by which Amazon will ask for volunteer grand jury witnesses from the pool of D'Angelo's Amazon customers will protect the First Amendment rights of these customers while obtaining for the grand jury the witnesses it needs to complete its investigation.

While reserving the right to appeal this decision after further reflection, both sides agreed to begin drafting the letters necessary to implement Step (4). They agreed to a timeline by which they would exchange proposed drafts by the end of this week, exchange comments shortly thereafter, then report back to the court the week of July 9, 2007, hopefully with consensus

letters and a draft order, or perhaps with competing documents that would require additional arguments to the court followed by a court decision.

To backfill just a bit, I have concluded that the court got it right in the case of *In re: Grand Jury Subpoena to Kramerbooks & Afterwards, Inc.*, 26 Med. L. Rptr. 1599 (D.D.C. 1998). Although the Supreme Court in cases such as *United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991), and *Branzburg v. Hayes*, 408 U.S. 665 (1972), never directly has imposed a higher standard for reviewing grand jury subpoenas that implicate First Amendment concerns, the Court has implied that lower courts should be mindful of any non-speculative First Amendment concerns when determining motions to quash subpoenas. Whether one calls this a "substantial relationship" test, *see In re: Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 232 (4th Cir. 1992), or a "compelling interest" test, *see In re: Grand Jury Subpoenas Duces Tecum*, 78 F.3d 1307, 1312 (8th Cir. 1996), the result is the same: although a grand jury subpoena is presumed valid and enforceable, if the witness demonstrates a legitimate First Amendment concern raised by the subpoena, then the government must make an additional showing that the grand jury actually needs the disputed information. Implicitly and logically, the reviewing court should use its discretion to fashion a solution that accommodates the legitimate needs of both the grand jury and the protesting witness.

In the instant case, we start with the presumption that the grand jury issued the challenged subpoena to Amazon in good faith in an attempt to obtain relevant information. Amazon does not dispute the government's claim that it is not seeking the identities of the sample of D'Angelo's used book buyers out of any interest in the book buyers themselves. Rather, these buyers merely are potential witnesses to D'Angelo's alleged fraud and tax evasion

3

schemes by virtue of having completed financial transactions with him. It happens, however, that these transactions involved an expressive medium rather than pottery, bricks or widgets.

This presents a legitimate First Amendment concern. The subpoena is troubling because it permits the government to peek into the reading habits of specific individuals without their prior knowledge or permission. True, neither the government nor the grand jury is directly interested in the actual titles or content of the books that people bought, and I have enormous trust in the prosecutors and agents handling this investigation, with whom this court has worked many times before. But it is an unsettling and un-American scenario to envision federal agents nosing through the reading lists of law-abiding citizens while hunting for evidence against somebody else. In this era of public apprehension about the scope of the USAPATRIOT Act, the FBI's (now-retired) "Carnivore" Internet search program, and more recent highly-publicized admissions about political litmus tests at the Department of Justice, rational book buyers would have a non-speculative basis to fear that federal prosecutors and law enforcement agents have a secondary political agenda that could come into play when an opportunity presented itself. Undoubtedly a measurable percentage of people who draw such conclusions would abandon online book purchases in order to avoid the possibility of ending up on some sort of perceived "enemies list."[1]

Taken a step further, if word were to spread over the Net–and it would–that the FBI and the IRS had demanded and received Amazon's list of customers and their personal purchases,

---

[1] I am not finding that such fears are well-founded, but neither can I find them completely speculative or irrational. Quite apart from any book buyer's personal fear of federal apparatchiks or black helicopters is the more commonly shared notion that living in the land of the free means that it's none of the government's business what books people are reading.

the chilling effect on expressive e-commerce would frost keyboards across America. Fiery rhetoric quickly would follow and the nuances of the subpoena (as actually written and served) would be lost as the cyberdebate roiled itself to a furious boil. One might ask whether this court should concern itself with blogger outrage disproportionate to the government's actual demand of Amazon. The logical answer is yes, it should: well-founded or not, rumors of an Orwellian federal criminal investigation into the reading habits of Amazon's customers could frighten countless potential customers into canceling planned online book purchases, now and perhaps forever. Let me re-emphasize that I have no concerns about the government's good faith and intent in the instant case. Amazon, however, has a legitimate concern that honoring the instant subpoena would chill online purchases by Amazon customers. This First Amendment concern is a factor for the court to consider when determining whether to require compliance with the subpoena as currently configured.

So, although no Supreme Court precedent yet has required the government to pass a test of substantial relation or compelling need, I have required the government to explain the grand jury's investigative need for the identities of people who purchased used books from D'Angelo. The government's ex parte affidavit and the prosecutors' answers to my questions during the ex parte portion of the June 25, 2007 hearing establish that the government has a bona fide investigative need to contact and interview at least some of the people who bought used books from D'Angelo through Amazon. Therefore, I will not quash the subpoena.

Nonetheless, I have concluded that at this juncture (and perhaps at every juncture), the government is not entitled to unfettered access to the identities of even a small sample of this group of book buyers without each book buyer's permission. Everyone involved in this dispute

agrees that the book buyers have done nothing wrong and face no direct scrutiny; accordingly, they should not be put unnecessarily to the embarrassment of an unsolicited FBI interview that might specifically deter them from future recorded book purchases or generally deter others who learn of this investigation.

Accordingly, I have ordered a filtering mechanism that calls for volunteer witnesses from the enormous pool of customers who bought used books from D'Angelo. Essentially, Amazon will send a letter to a subset of the 24,000 purchasers, advising them in general terms of the government's investigation and the customer's potential role in it. Amazon will attach a letter from the United States Attorney's Office providing the government's perspective, and a copy of another order prepared by this court that establishes the limits of Amazon's and the book buyer's responsibilities at this point. This packet will allow any used book buyer who chooses to cooperate with the investigation to contact the government and arrange an interview. Anyone who wishes *not* to participate in this exercise, by virtue of his or her silence, will be left alone, and the government will never learn that person's identity or the titles of materials he/she purchased from D'Angelo through Amazon.

The content of these letters and orders, plus the size and geographic location of the sample have yet to be determined. If the parties do not appeal this order, then they anticipate working toward a consensus on the contents of all three documents. In the event consensus eludes them, then the court will determine the contents of the documents after giving the parties another opportunity to be heard.

Finally, I denied without prejudice Amazon's motion to unseal its documents. Notwithstanding the D'Angelo media tidbits someone is chumming into the local waters, D'Angelo is entitled at this time to avoid the publicity that would be triggered by unsealing the instant dispute, even if the documents were redacted. Similarly, the grand jury has a legal obligation to maintain the secrecy of its investigation to the greatest extent possible. Unsealing the documents generated in this dispute would violate that obligation. If the grand jury later returns a true bill against D'Angelo, closes its investigation without an indictment, or if some other event occurs that genuinely calls into question the need for continued secrecy, then Amazon may move for reconsideration. For now, however, all documents submitted to this court on this matter will remain under seal.

Entered this 26th day of June, 2007.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge